IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,       )
                                )
          v.                    )
                                )       1:06cr51(JCC)
ADEBIMPE ADEROJU,               )
                                )
          Defendant.            )

## M E M O R A N D U M   O P I N I O N

This matter comes before the Court on Defendant's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  For the following reasons, the Court will grant Defendant's motion.

### I.  Background

On February 9, 2006, Defendant, Adebimpe Aderoju, was returning to the United States from Nigeria when she was arrested at Dulles International Airport while carrying a suitcase with a hidden compartment that contained approximately 2.8 kilograms of heroin.  On February 14, 2006, a federal grand jury returned a three-count indictment charging Defendant with: (1) importation of heroin in violation of 21 U.S.C. § 952(a); (2) bringing and possessing heroin on board an aircraft arriving in the United States in violation of 21 U.S.C. § 955; and (3) possession with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 841(a)(1).  Defendant was arraigned before Judge Brinkema on February 24, 2006.  At that time, Judge Brinkema entered an agreed discovery order providing that the "Government

shall disclose to the defendant and make available for inspection, copying or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the Government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the Government . . . ." *United States v. Aderoju*, No. 06-51 (E.D. Va. Feb. 24, 2006) (discovery order).

This Court subsequently conducted a two-day jury trial beginning on April 24, 2006.  The sole issue at trial was Defendant's knowledge of the contents of her suitcase.  The heroin itself was found in a secret compartment inside the shell of the suitcase, and Defendant claimed that she was asked to carry the suitcase to the United States by several individuals known to her.  The Government presented circumstantial evidence of Defendant's knowledge and/or willful blindness, focusing mainly on the weight and appearance of the suitcase, Defendant's inconsistent statements to law enforcement officers, Defendant's demeanor immediately before her arrest, and Defendant's bank deposits and cash purchases of airline tickets.  Defendant testified in her own defense, denying knowledge of the heroin.

On April 26, 2006, the jury found Defendant guilty on all counts.  On May 26, 2006, Defendant filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal

Procedure.[1]  Defendant claims that three instances of prosecutorial misconduct constituted cumulative error that resulted in an unfair trial.  Defendant's motion is currently before the Court.

## II.  Standard of Review

Rule 33 of the Federal Rules of Criminal Procedure grants the trial court discretion to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  According to the Fourth Circuit, "Rule 33 confers broad discretion on a district court."  *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000).  Furthermore, "the interest of justice is the touchstone for consideration" under Rule 33.  *United States v. Mitchell*, 602 F.2d 636, 639 (4th Cir. 1979).  A leading treatise instructs that "[a]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial."  3 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 556 (3d ed. 2004).

## III.  Analysis

The Government argues that the standard governing Defendant's motion for a new trial is set forth in *United States v. Wilson*, 118 F.3d 228 (4th Cir. 1997), and *United States v. Arrington*, 757 F.2d 1484 (4th Cir. 1985).  In *Wilson*, the Fourth

---

[1]This Court granted Defendant's motion for an extension of time, thereby permitting Defendant to file her motion for a new trial outside of the seven-day period mandated by Fed. R. Crim. P. 33(b)(2).

Circuit noted that "a district court should exercise its discretion to grant a new trial 'sparingly' and that the district court should grant a new trial based on the weight of the evidence 'only when the evidence weighs heavily against the verdict.'"  *Id.* at 237 (quoting *Arrington*, 757 F.2d at 1486).  In *Arrington*, the Fourth Circuit held that a district court should should grant a motion for a new trial only "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Arrington*, 757 F.2d at 1485.

Each of the cases cited by the Government relates to the standard that applies when a defendant claims that the evidence adduced at trial was insufficient to support a guilty verdict.  *See United States v. Chin*, No. 96-4826, 1999 U.S. App. LEXIS 10859, *4-5 (4th Cir. May 26, 1999) (defendant claimed that he was convicted based on evidence that was not credible); *Wilson*, 118 F.3d at 237 (defendant argued that jury's verdict was against the weight of the evidence); *Arrington*, 757 F.2d at 1485 (defendant's motion attacked the weight of the evidence).  The standard recited in these cases is distinct from that which must be applied in the present case.  In the case at bar, Defendant's motion is based on three specific instances of alleged prosecutorial misconduct.  In determining whether prosecutorial misconduct entitles Defendant to a new trial, the Court must conduct a two-part inquiry: (1) whether the prosecutor's remarks

-4-

or conduct were, in fact, improper; and (2) whether such remarks or conduct prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.  *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993).  With this standard in mind, the Court will turn to each of the three instances cited by Defendant as prosecutorial misconduct.

A.  Defendant's Letter to the University of Maryland Financial
    Aid Office

Defendant attended the University of Maryland during the 2002-2003 school year.  At an undetermined time before the fall of 2004, Defendant wrote a letter to the University of Maryland Financial Aid Office seeking reinstatement of her financial aid, which had been terminated for academic performance reasons.  In this letter, Defendant attributed her academic performance to the death of her grandfather.  The letter did not specify which of Defendant's grandfathers had passed away and did not discuss the particulars of his death.  As became evident at trial, the letter contained false information.

The Government represents that it obtained this letter pursuant to a request it sent the University of Maryland for confirmation of Defendant's prior enrollment there.  The Government did not turn the letter over to Defendant until after the trial had commenced.  Defendant argues that failure to disclose the letter resulted in substantial prejudice to her, as the Government strongly relied on the letter to impeach her

-5-

testimony, stressing the letter's falsity in a substantial portion of its closing argument to the jury.

The Federal Rules of Criminal Procedure require the Government to disclose to the Defendant, upon request, "any *relevant* written or recorded statement by the defendant if:  the statement is within the government's possession, custody, or control; and the attorney for the government knows . . . that the statement exists."  Fed. R. Crim. P. 16(a)(1)(B)(i) (emphasis added).[2]  Rule 16 requires disclosure regardless of whether the statements are used for direct substantive proof, for impeachment, or for rebuttal purposes.  *See United States v. Scafe*, 822 F.2d 928, 935 (10th Cir. 1987).  The Rule encompasses both statements made to Government agents and statements made to third parties.  *See id.* at 936.

The first question for consideration is whether the nondisclosure was improper, and here, the parties' dispute centers over whether the letter was relevant before trial.  The Government argues that the letter was not relevant to the crimes charged against Defendant and did not become relevant for its impeachment value until after Defendant's family members testified that Defendant's paternal grandfather died ten or twelve years before and that Defendant's maternal grandfather

---

[2]On February 24, 2006, Judge Brinkema entered a discovery order in this case, which contained language similar to Rule 16(a)(1)(B)(i).

died on November 20, 2005.  The Government notes that it "is not obligated by Rule 16(a) to anticipate every possible defense, assume what the defendant's trial testimony (if [s]he decides to testify) will be, and then furnish [her] with otherwise irrelevant material that might conflict with [her] testimony." *United States v. Gleason*, 616 F.2d 2, 25 (2d Cir. 1979).

This view of the letter's irrelevance is belied, however, by the Government's deliberate elicitation during its case-in-chief of testimony relating to the dates of death for both of Defendant's grandfathers.  During its case-in-chief, the Government called Defendant's brother, John Aderoju, to testify. From this witness, the Government elicited testimony that Defendant's maternal grandfather died on November 20, 2005 and that Defendant traveled to Nigeria in December 2005 to attend this grandfather's funeral.  The Government then began to question the witness about the date of Defendant's paternal grandfather's death, confirming that he passed away sometime before 2001.  At that stage in the proceedings, there was no purpose for educing testimony about the death of Defendant's paternal grandfather except to lay the foundation for introducing Defendant's letter as a prior false statement.

Under Rule 16, relevance "is to be interpreted broadly in deference to the policy judgment that 'disclosure, rather than suppression, of relevant materials ordinarily promotes the proper

administration of criminal justice.'"  *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) (quoting *Dennis v. United States*, 384 U.S. 855, 870 (1966)).  The circumstances of this case amply demonstrate that Defendant's letter to the University of Maryland had relevance at the outset of trial as impeachment evidence.[3]  The Government's failure to disclose the letter before trial was a violation of its obligations under Rule 16 and the discovery order.

The second question for consideration is whether the nondisclosure of the letter prejudicially affected Defendant's substantial rights so as to deprive her of a fair trial.  An assessment of prejudice requires the Court to analyze "the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof."  *United States v. Stevens*, 985 F.2d 1175, 1181 (2d Cir. 1993).

The sole issue in this case was whether Defendant knew about the heroin contained within the secret compartment of her

---

[3]At the very least, before trial the letter appeared to be potentially contradictory with Defendant's explanation for her trip to Nigeria in December 2005.  In this respect, the letter might have been viewed as relevant impeachment evidence, at least until John Aderoju confirmed that Defendant's maternal grandfather died on November 20, 2005.  Even if the Government did not view the letter as potentially contradictory with Defendant's account, however, it is clear that the Government conducted its case-in-chief in a manner to lay the foundation to establish that the letter was a prior false statement.  The Government cannot now be heard to claim that the letter was irrelevant before trial.

suitcase.  The Government presented no direct proof of
Defendant's knowledge of the heroin.  Instead, the Government
relied only on circumstantial evidence of Defendant's knowledge
and/or willful blindness, and the Government's proof in this
respect cannot be characterized as overwhelming.

For example, the Government relied on the appearance
and weight of the suitcase, emphasizing that there were brown
streaks of glue surrounding the lining on one side of the
suitcase and that the suitcase was unusually heavy and leaned to
one side.  The heroin was found, however, inside the shell of the
suitcase itself and was invisible even when the suitcase lining
was removed.  Defendant, for her part, testified at trial that
she only carried the suitcase for a short period of time before
checking her luggage en route to the United States and that it
was filled with clothes at the time.

As evidence of Defendant's willful blindness, the
Government cited Agent Michael Honicker's testimony that
Defendant told him "that she knew there was something wrong with
the suitcase but did not want to know the details."  (Tr. Vol. I,
at 99.)  Defendant testified that her comment to Honicker
referred to her problems closing the suitcase at the airport in
Nigeria, not to the possibility that the suitcase might contain
contraband.  The Government also noted that she heard the planned
recipient of the heroin use the Yoruba slang word for "drugs" on

one occasion.  Honicker conceded, however, that the Yoruba word
could also have meant "packages."

The Government's circumstantial evidence also included
several inconsistent stories that Defendant told law enforcement
officers over time.  According to the Government's witnesses,
Defendant gave varying accounts regarding whether anyone else had
asked her to carry the suitcase and whether she previously knew
the individual who asked her to carry the suitcase.  On the other
hand, Defendant testified at trial that she initially told the
officers at Dulles the account of events that she related in her
trial testimony.  According to Defendant's testimony, she
subsequently changed her story in response to pressure from
Honicker and others.

The point of this discussion is not to assess
Defendant's credibility versus the credibility of the
Government's witnesses, but rather to demonstrate that
Defendant's credibility was a critical question.  In this
context, the letter played a crucial role for the Government in
impeaching Defendant's testimony.  In his closing argument, the
prosecutor discussed the letter extensively, characterizing it as
"dripping with emotion."  (Tr. Vol. II, at 443.)  He went on to
emphasize the falsity of the letter, concluding, "[i]f she would
lie to the University of Maryland, why wouldn't she lie to you?"
(*Id.*)  Subsequently, in his rebuttal argument, the prosecutor

read the letter in its entirety and concluded his reading by stating, "[t]otal fabrication, total lie."  (Tr. Vol. II, at 467-69.)

In this manner, the letter substantially aided the Government in its portrayal of Defendant as an individual who would lie in circumstances where it would benefit her to do so. Defendant was deprived of an opportunity, however, to investigate the circumstances surrounding the writing of the letter.[4] Furthermore, the nondisclosure of the letter gave the Government a significant strategic advantage and deprived Defendant of the opportunity to make a completely informed decision, before trial began, about whether to testify.  *See United States v. Thomas*, 239 F.3d 163, 168 (2d Cir. 2001) (reasoning that the decision whether to testify is a key part of trial strategy that can be adversely affected by delayed production of a document with substantial impeachment value).  In light of all the circumstances, the Court concludes that nondisclosure of the letter resulted in prejudice to Defendant.

---

[4]At the hearing on this motion, Defendant introduced testimony from Roberto Rivera, an investigator with the Federal Public Defender's Office. Rivera testified that he did not receive the letter until the afternoon of the first day of trial and that, in response, he attempted to obtain Defendant's financial aid records from the University of Maryland.  He further testified that the time and circumstances did not allow him an opportunity to examine Defendant's complete records.

B.  Vouching/Bolstering During Closing Argument

During his rebuttal argument, the prosecutor made the following statement:

> Now, I have to say something about professionalism.
> Now, you saw the agents of the United States government
> get up on the witness stand and testify.  I hope that
> none of you thought those people were anything less
> than true professionals.  To suggest that a sworn law
> enforcement officer, federal law enforcement officer
> would get up on that witness stand and lie because he
> has some agenda --
>
> . . .[5]
>
> His agenda, his agenda, his oath of office, as a sworn
> federal law enforcement officer, is to protect the
> innocent and prosecute the guilty.  I suggest to you
> that protecting the innocent is every bit as much as
> his concern as it is to prosecute the guilty.  If he
> thought this woman was innocent, he certainly wouldn't
> have proceeded in prosecuting this case.

(Tr. Vol. II, at 470-71.)  Defendant argues that these statements constituted impermissible vouching for or bolstering of the testimony of Agent Michael Honicker, a Special Agent with

---

[5]At this point, Defendant's counsel interposed an objection, which was overruled.  Because Defendant's counsel did not repeat his objection, the Government argues that the subsequent portion of its closing argument is subject to plain error analysis.  The Court disagrees.  Defense counsel objected to the intimation that a "sworn law enforcement officer" would not lie, and the Court overruled the objection, thus obviating the need for a further objection.  *See* Fed. R. Evid. 103(a).  In any event, when ruling on a motion for new trial, this Court is not bound to consider whether the allowance of this closing argument constituted "plain error" under Rule 52 of the Federal Rules of Criminal Procedure; rather, this Court has broad discretion to determine whether the interests of justice require a new trial.  *See United States* v. *Sardesai*, No. 96-4228, 1997 U.S. App. LEXIS 27952, *16 n.8 (4th Cir. Oct. 10, 1997) (distinguishing trial court's discretion under Rule 33 from appellate authority to reverse for plain error under Rule 52(b)).

Immigrations and Customs Enforcement who testified for the Government.

A prosecutor may not vouch for or bolster the testimony of government witnesses to the jury. "Vouching occurs when a prosecutor indicates a personal belief in the credibility or honesty of a witness; bolstering is an implication by the government that the testimony of a witness is corroborated by evidence known to the government but not known to the jury." *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997). Consistent with these principles, "the prosecution may not portray itself as a guarantor of truthfulness." *United States v. Collins*, 415 F.3d 304, 308 (4th Cir. 2005) (internal quotation marks and citation omitted).

Various circuit courts have held prosecutorial arguments similar to that in the case at bar to be improper. For instance, a prosecutor may not refer to the oath taken by a law enforcement witness in an attempt to augment that witness's credibility. *See United States v. Cornett*, 232 F.3d 570, 575-76 (7th Cir. 2000) (holding, where the prosecutor stated that police officers take an oath to follow the law, that "the prosecutor simply bolstered the credibility of the police officers by commenting on their occupational integrity"); *United States v. Pungitore*, 910 F.2d 1084, 1125 (3d Cir. 1990) (holding that "it is inappropriate for a prosecutor to invoke his or her oath of

-13-

office as a means of defending the credibility of government witnesses"). It is also improper for a prosecutor to insinuate that a criminal prosecution would not have been commenced unless it had already been determined that the defendant was guilty. *See United States v. Garza*, 608 F.2d 659, 664-65 (5th Cir. 1979) (reversing a conviction where the prosecutor argued, among other things, that government agents had no interest in convicting the wrong person).

The Government argues that the above-quoted rebuttal remarks were a proper response to a portion of Defendant's closing argument. Where appropriate, a court considering allegedly improper statements by a prosecutor must consider whether the comments were invited by the defense and whether the remarks "did no more than respond substantially in order to right the scale." *United States v. Young*, 470 U.S. 1, 12-13 (1985). In such circumstances, the prosecutor's comments will not warrant a new trial. *See id.*

In his own closing argument, defense counsel stated:

> You should remember: The government's agents are professionals. They testify all the time, and they have a professional interest in getting a conviction. This is, as Agent Honicker told you, one of his first cases. There is evidence showing a lack of a full investigation in this case.
>
> . . .
>
> [Agent Honicker] made no real effort to find S[h]ade James to see if she would exonerate Ms. Adebimpe

Aderoju because he had made up his mind and had tunnel vision.

(Tr. Vol II, at 464.)  Contrary to the Government's claim, this statement did not invite the improper argument that followed. The first portion of defense counsel's comment was entirely consistent with an instruction given by this Court to the jury, to the effect that, "it's quite legitimate for defense counsel to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case."  (Tr. Vol II, at 499.)  The Court's instruction was drawn from a recognized standard instruction on law enforcement witnesses.  *See* 1 L. Sand, *et al.*, *Modern Federal Jury Instructions - Criminal*, § 7.01, Instruction 7-16 (2005).

The second portion of the above-quoted comment constituted a fair inference from the evidence produced in this case.  During his cross-examination of Agent Honicker, defense counsel asked Honicker a series of questions regarding the steps taken to investigate Shade James, the planned recipient of the heroin found in Defendant's suitcase.  During this time, Honicker testified that Immigration and Customs Enforcement had not been able to locate James, and he admitted that no one had attempted to obtain a driver's license report on James, contact the phone numbers listed in James's phone records, or contact the Nigerian consulate to obtain information on the international phone

numbers that had been dialed in the investigation.  (Tr. Vol I, at 123.)  Honicker also admitted that no one fingerprinted the bag in which the heroin was found or the interior of the suitcase near the secret compartment that contained the heroin.  (Tr. Vol I, at 124.)  Thereafter, in the portion of his closing argument immediately preceding the statement complained of by the Government, defense counsel summarized these deficiencies in Honicker's investigation.  (*See* Tr. Vol II, at 464.)  His statement that Honicker "made no real effort to find S[h]ade James" was a fair comment on this evidence.

Thus, the first portion defense counsel's closing argument was in accord with this Court's jury instructions as well as recognized model instructions.  The second portion of the argument was nothing more than a fair inference drawn from and a comment on the evidence.  Accordingly, the prosecutor's subsequent rebuttal argument was not invited by the defense attorney's closing argument and was improper.

The Government also contends that Defendant suffered no prejudice as a result of the prosecutor's statement.  Even if a defendant establishes that improper vouching or bolstering occurred, a new trial is warranted only where the statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Morsley*,

64 F.3d 907, 913 (4th Cir. 1995).  In assessing the prejudice

prong, the Court should consider six factors:

> (1) the degree to which the prosecutor's remarks had a
> tendency to mislead the jury and to prejudice the
> defendant; (2) whether the remarks were isolated or
> extensive; (3) absent the remarks, the strength of
> competent proof introduced to establish the guilt of
> the defendant; (4) whether the comments were
> deliberately placed before the jury to divert attention
> to extraneous matters; (5) whether the prosecutor's
> remarks were invited by improper conduct of defense
> counsel; and (6) whether curative instructions were
> given to the jury.

*United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002).

Honicker's credibility was an important factor in the

instant case.  For example, the Government relied in part on the

fact that Defendant told Honicker conflicting accounts of her

relationship with Al Haji Ladi, the individual who asked

Defendant to carry the suitcase containing the heroin, during

Honicker's interrogation of her.  Honicker's testimony was the

primary evidence of the statements made by Defendant during her

interrogations.  This fact increased the prejudice that was

likely to result from any impermissible vouching for Honicker's

testimony.  *See United States v. Necoechea*, 986 F.2d 1273,

1276 (9th Cir. 1993) ("Vouching is especially problematic in

cases where the credibility of the witnesses is crucial.").

In addition, it is noteworthy that the prosecutor's

improper comments occurred during his rebuttal argument.  Because

defense counsel had no opportunity to controvert the prosecutor's

statements before the jury, the prejudice caused by such statements was further enhanced.  *See United States v. Carter*, 236 F.3d 777, 788 (6th Cir. 2001) (holding that prejudice was heightened where "[t]he prosecutor's improper comments occurred during his rebuttal argument and therefore were the last words from an attorney that were heard by the jury before deliberations.").

       With respect to curative instructions, the Government highlights that the Court instructed the jury that "[i]f any reference by the Court or by counsel to testimony or exhibits does not coincide with your recollection of that evidence, it is your recollection which controls during your deliberations, and not the statements of Court or of Counsel."  (Tr., Vol. II, at 485.)  This instruction was general, however, and was not linked to the improper portion of the prosecutor's closing argument.  Furthermore, the instruction was not given at the time of the improper comments, but rather was given after the conclusion of closing arguments, along with all other routine instructions.  In such circumstances, the instruction was unlikely to cure any prejudice resulting from the prosecutor's comments.  *See Carter*, 236 F.3d at 787-88; *Lesko v. Lehman*, 925 F.2d 1527, 1546-47 (3d Cir. 1991).  Accordingly, in light of these factors, as well as the entirely circumstantial nature of the Government's case, the

Court concludes that the prosecutor's comments prejudiced Defendant.

C.  Defendant's Demeanor During the Inspection of Her Luggage

During its case-in-chief, the Government called Officer Edward Brennan to testify.  Brennan, a Customs and Border Protection employee, was one of the officers who encountered Defendant at the international arrivals area of Dulles International Airport.  Brennan testified that after Defendant retrieved her luggage from the luggage carousels, she was referred to the secondary inspection area.  Brennan noted that Defendant appeared to be calm and relaxed as she approached the secondary inspection area.  After an initial examination of Defendant's luggage, including the silver suitcase containing the heroin, Officer Lajuan Brodie took the silver suitcase to be x-rayed.  Brennan, who was standing with his back to the x-ray machine and conversing with Defendant, described Defendant's reaction as follows:

> I think Officer Brodie took the luggage.  She was gone out of my sight for approximately 15 minutes.  The first minute or so, I think, I continued some small conversation about [Defendant's] education with her. Then, as Officer Brodie x-rayed the machine [sic] her focus shifted from me and was 100 percent on the luggage.  I disappeared from that point on.  All her focus was over my shoulder looking at the suitcase.

(Tr. Vol. I, at 44-45.)

Subsequently, in the prosecutor's rebuttal argument, he made the following statement:

> Remember the testimony of Special Agent Brennan.  He
> said, as soon as they took the suitcase -- he was
> talking to her.  As soon as they took that suitcase
> over to the table by the x-ray machine, it was as if
> she was looking right through me.  She was, in his
> words, fixated on that suitcase.  "Fixated" was the
> word he used.
>
> Why?  Why if the suitcase, A, was not hers, B,
> contained some African garments would she be fixated on
> that suitcase?  He also told you she began to become
> very nervous.  Again, why?  Why?  Sometimes it's the
> little things that you look at that really are
> indicators of where the truth lies.

(Tr. Vol. II, at 476.)  Defendant argues that the prosecutor's

closing argument constituted a misquotation of Brennan's

testimony and a mischaracterization of the evidence, which

prejudiced her by suggesting consciousness of guilt.

Defendant correctly notes that "[i]t is error for

counsel to make statements in closing argument unsupported by

evidence, to misstate admitted evidence, or to misquote a

witness' testimony." *United States v. Watson*, 171 F.3d 695, 699

(D.C. Cir. 1999).  Here, however, the prosecutor did not engage

in any of the above practices.  While Brennan did not explicitly

state that Defendant was nervous at the time her luggage was

being x-rayed, Defendant's nervousness was a fair inference from

the change in demeanor to which Brennan testified.  Furthermore,

the word "told" implies that Brennan conveyed the fact that

Defendant was nervous but does not necessarily mean that the

prosecutor was purporting to quote Brennan.[6]  The prosecutor's argument was not improper, and the Court will therefore not base its decision to grant a new trial on this assignment of error.

## IV.  Conclusion

In conclusion, the Court must emphasize that there is no indication that the prosecuting attorneys committed either of the cited errors or conducted any other portion of this trial in bad faith.  While the misconduct was not particularly egregious, a new trial is necessary in light of the lack of strong evidence against Defendant, the importance of the credibility of the key witnesses, and the probable impact of the misconduct on the jury's assessment of credibility.  For the foregoing reasons, the Court will grant Defendant's motion for a new trial.  An appropriate Order will issue.

August 2, 2006                  _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE

---

[6]The only instance in which the prosecutor purported to quote Brennan occurred when he stated, "'[f]ixated' was the word [Brennan] used."  While Brennan did not actually use the word "fixated" in his testimony, the prosecutor's use of the word to describe Defendant's demeanor certainly was not prejudicial since Brennan did, in essence, testify that Defendant was fixated on the suitcase.